# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RODNEY D. ARCHER,                    )
                                     )
                   Plaintiff,        )
                                     )
          v.                         )          1:24CV531
                                     )
CABARRUS COUNTY COURTHOUSE,          )
DISTRICT COURT DIVISION, et al.,     )
                                     )
                   Defendants.       )
_____

RODNEY D. ARCHER,                    )
                                     )
                   Plaintiff,        )
                                     )
          v.                         )          1:25CV74
                                     )
CABARRUS COUNTY COURTHOUSE,          )
DISTRICT COURT DIVISION, et al.,     )
                                     )
                   Defendants.       )

## MEMORANDUM OPINION, ORDER, AND
## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

The two, related, above-captioned cases come before the Court

on an Application for Leave to Proceed In Forma Pauperis filed by

Plaintiff in the first case (see 1:24CV531 (the "First Case"),

Docket Entry 1)[1] and a Request to Initiate Federal Lawsuit filed by

Plaintiff in the second case (see 1:25CV74 (the "Second Case"),

Docket Entry 3), respectively. (See 1:24CV531, Docket Entry dated

June 28, 2024; 1:25CV74, Docket Entry dated Feb. 25, 2025.)  The

_____

[1] Parenthetical citations list the case number, docket entry
number, and (if applicable) the page number(s) for the cited
document from the footer appended to the cited document upon its
docketing in the CM/ECF system (not any original pagination).

Court (A) will grant the instant Application, for the limited purpose of recommending (i) dismissal of all federal claims in the First Case under 28 U.S.C. § 1915(e)(2)(B), as frivolous, for failure to state a claim, and/or due to immunity doctrines, and (ii) dismissal without prejudice of all state claims in the First Case under 28 U.S.C. § 1367(c)(3), and (B) will deny the instant Request, due to the fraudulent nature of the items Plaintiff submitted to pay the filing fee in the Second Case (see 1:25CV74, Docket Entry 1-1 at 2; 1:25CV74, Docket Entry 3-1) and for the purpose of recommending (i) dismissal of all federal claims in the Second Case based on the Court's inherent authority "to dismiss a frivolous or malicious action," Mallard v. United States Dist. Ct. for the S. Dist. of Iowa, 490 U.S. 296, 307-08 (1989) (internal quotation marks omitted), and (ii) dismissal without prejudice of all state claims in the Second Case under Section 1367(c)(3).

LEGAL BACKGROUND

By statute, "[t]he clerk of each district court shall require the parties instituting any civil action . . . to pay a filing fee of $350," 28 U.S.C. § 1914(a), and "shall collect from the parties such additional fees only as are prescribed by the Judicial Conference of the United States," 28 U.S.C. § 1914(b); see also 28 U.S.C. § 1914 addendum, Judicial Conference Schedule of Fees (Dec. 1, 2023) (imposing "[a]dministrative fee for filing a civil action [of] . . . $55"). "The federal in forma pauperis statute, first

2

enacted in 1892 [and now codified at 28 U.S.C. § 1915], is intended to guarantee that no citizen shall be denied access to the courts solely because his poverty makes it impossible for him to pay or secure the costs." Nasim v. Warden, Md. House of Corr., 64 F.3d 951, 953 (4th Cir. 1995) (en banc) (internal quotation marks omitted). However, that statute also provides, inter alia, that "the court shall dismiss the case at any time if the court determines that . . . (B) the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2). The United States Supreme Court also has explained that, although Section 1915 "authorizes courts to dismiss a 'frivolous or malicious' action, [] there is little doubt they [] have power to do so even in the absence of this statutory provision." Mallard, 490 U.S. at 307-08; see also Brown v. Maynard, Civ. No. 11-619, 2011 WL 883917, at *1 (D. Md. Mar. 11, 2011) (unpublished) ("[I]t is well established that a court has broad inherent power sua sponte to dismiss an action, or part of an action, which is frivolous, vexatious, or brought in bad faith." (italics omitted)).

"[A] complaint . . . is frivolous where it lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989). To make that assessment, the Court "appl[ies] common sense." Nasim, 64 F.3d at 954. In turn, "[a] complaint

plainly abusive of the judicial process is properly typed malicious." Crisafi v. Holland, 655 F.2d 1305, 1309 (D.C. Cir. 1981); accord, e.g., Galeas v. Byrd, No. 3:11CV543, 2011 WL 6370373, at *3 (W.D.N.C. Dec. 20, 2011) (unpublished), aff'd, 469 F. App'x 236 (4th Cir. 2012).

The second ground for dismissal under Section 1915(e)(2)(B) attaches if a complaint fails "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. In other words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.[2]

The third ground for dismissal under Section 1915(e)(2)(B) generally applies to situations in which doctrines established by the United States Constitution or at common law immunize governments and/or government personnel from liability for monetary

---

[2] Although "[a] document filed pro se is to be liberally construed and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal citation and quotation marks omitted), the United States Court of Appeals for the Fourth Circuit has "not read Erickson to undermine Twombly's requirement that a pleading contain more than labels and conclusions," Giarratano v. Johnson, 521 F.3d 298, 304 n.5 (4th Cir. 2008) (internal quotation marks omitted).

4

damages. See, e.g., Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984) (discussing sovereign immunity of states and state officials under Eleventh Amendment); Pierson v. Ray, 386 U.S. 547 (1967) (describing interrelationship between 42 U.S.C. § 1983 and common-law immunity doctrines, such as judicial immunity); cf. Allen v. Burke, 690 F.2d 376, 379 (4th Cir. 1982) (noting that, even where "damages are theoretically available under [certain] statutes . . ., in some cases, immunity doctrines and special defenses, available only to public officials, preclude or severely limit the damage remedy" (internal quotation marks omitted)).

### PLAINTIFF'S FILINGS

Plaintiff commenced the First Case by filing (along with the instant Application) a Complaint for Violation of Civil Rights (1:24CV531, Docket Entry 2 (the "First Complaint")) against the "Cabarrus County Courthouse, District Court Division" (id. at 2 (all-caps font omitted)), five district court judges in Cabarrus County (see id.), a child support enforcement ("CSE") attorney for Cabarrus County (see id. at 3), a "Matriarch Parent" (id.), her attorney (see id.), the CSE Division of the North Carolina Department of Health and Human Services ("NC DHHS") (see id.), and two of its employees (see id.).[3] According to the First Complaint, "[u]nder 42 USC, Section 1983, this lawsuit comes against state and

---

[3] With the exception of the Matriarch Parent's attorney, the body of the First Complaint purports to name all Defendants in their official capacity. (See 1:24CV531, Docket Entry 2 at 2-3.)

5

local officials and accomplices for the deprivation of rights, privileges and immunities secured by the US Constitution and federal laws." (Id. at 4 (internal brackets and quotation marks omitted).) As the "constitutional and statutory rights being violated" (id.), the First Complaint identifies (A) seven federal constitutional provisions (see id. ("14th Amendment – Due Process & Equal Protection of Laws," "13th Amendment – Abolishment of Slavery or Involuntary Servitude," "5th Amendment – Double Jeopardy," "8th Amendment – Excessive Bail Shall Not Be Required," "Contract Clause – Article [I], Section 10, Clause 1," and "Supremacy Clause – Article VI, Clause 2")), along with (B) the "Privacy Clause . . . [of an ]Irrevocable, Non-Statutory Trust" (id.), (C) the "Declaration of Independence" (id.), (D) a "Notice of Reservation of Rights as living being filed on 1-18-24" (id.), (E) "28 USC 453 Oath of Justices & Judges" (id.), (F) four sections within Title 25 of the Code of Federal Regulations (see id.), and (G) numerous sections of the North Carolina Constitution and of the North Carolina General Statutes (see id.).

In regard to the nature of the alleged violations of those legal provisions, Plaintiff included within the First Complaint this "summary of [his g]eneral [c]omplaint[s] against [] Defendants in their official capacity and [their] accomplices" (id. at 5):

1. Purposeful denial and delay of parenting rights, though a fit parent.

2. Disregard of private agreements, privacy and the obligation of contracts, via irrevocable Trust.

3. Violation of 14th Amendment rights per Due Process and Equal Protection of Laws.

4. Fraud, Abuse, Human Trafficking, Extortion, Coercion, Duress by CSE and county court system.

5. Collusion for financial harm via NC [D]HHS, CSE division and all [D]efendants.

6. Violation of Civil Rules of Civil Procedures [sic], CSE Guidelines, etc. and Federal Laws.

(Id. (internal quotation marks omitted); accord id. at 6.)

To support those six, broad claims, the First Complaint relies on "[b]oth General Statements and Specific Statements regarding [] Defendants [sic] involvement in the alleged wrongful actions, along with dates and locations of all relevant events." (Id. at 5 (referring to id. at 6-12).) The General Statements generally offer more specifics than the Specific Statements. (Compare id. at 6-10 (setting out nine "General Statement[s]" with supporting allegations applicable to various groupings of Defendants), with id. at 11-12 (setting out 11 sets of "Specific Statement[s]," each (with one exception) aimed at a different Defendant).)[4] For

---

[4] Defendant Cabarrus County Courthouse and the two NC DHHS employee-Defendants (Sonja Tillman and Michelle Stapula) do not appear (by name) in any of the groupings of Defendants associated with the General Statements and the allegations under the General Statements do not mention Defendants Tillman and Stapula (by name). (See 1:24CV531, Docket Entry 2 at 6-10; see also id. at 3 (appearing to identify Defendants Tillman and Stapula as employees of CSE Division of NC DHHS).) Conversely, none of the Specific Statements target Defendant Benjamin Baucom. (See id. at 11-12.)

7

example, in connection with the first General Statement, i.e., "FRAUD, no Due Process and Equal Protection of Laws" (id. at 6 (bold font omitted)), levied against three Defendants (see id.), Plaintiff set out two paragraphs of allegations purporting to show that said Defendants "[s]uppressed [i]ncome of Mother and [i]mputed [i]ncome of Father" (id.), whereas the first Specific Statement consists of only three conclusory phrases totaling a mere fifteen words. (Compare id. at 6, with id. at 11.)

Following the General Statements and Specific Statements, the First Complaint concludes with this "Summary Statement and Declaration" (id. at 12 (bold font omitted)):

> [] Plaintiff is a sentient living being Rodney D. Archer protected under the Declaration of Independence, Bill of Rights and the Constitution of the United States, a free inhabitant bound by the law of the land (Common Law) and claimant of the American Republic, the De Jure government under God for which this nation, the United States of America was founded.
>
> [] Plaintiff is not subject to the Defacto government who rule the legal fiction created, the ENS LEGIS, RODNEY D. ARCHER without consent from the representative live agent. [] Plaintiff, thus the living being[,] does not give permission or personal jurisdiction to the county district courts and state schemes, nor wish to participate in any state plan. All payments done previously was [sic] done from deception and coercion and become grounds for fines and penalties of all [D]efendants in this suit.
>
> [] Plaintiff declares and reserves all rights from January 2012, forward, without recourse UCC 3-415b.

(Id.)

8

Lastly, as remedies, the First Complaint requests, in addition to damages, these forms of injunctive relief:

1. Dismiss case #22 CVD 627, IVD# 8721516 and 06 CVD 165, IVD# 5682631 with prejudice.

2. Set aside all arrears for both cases.

3. Reinstate life insurance license.

4. Remove passport restrictions[.]

5. Protection from all CSE punishments.  Plaintiff do [sic] not wish to participate in State plan.

6. Grant legal/physical custody with no primary of child[.]

7. Remove all negative credit reporting[.]

8. Expunge all jail records.

(Id. at 5; accord id. at 13; see also id. at 14 (specifying "$260k Total Damages" (bold font omitted)).)

Plaintiff subsequently instituted the Second Case by filing another Complaint for Violation of Civil Rights Act (1:25CV74, Docket Entry 1 (the "Second Complaint")), along with (A) something made to look like a check drawn on the "US Treasury" payable to the Clerk of this Court for $600.00 (1:25CV74, Docket Entry 1-1 at 2), (B) a document entitled "Basis For Check Draft" (id. at 1 (bold font omitted)),[5] (C) a copy of "House Joint Resolution 192" (id. at

_____

[5] That document declares, inter alia, that, "as Americans we have two choices, we can operate as the DEBTOR (via our fictional being) and pay from checking accounts, credit cards, savings or investments . . . [o]r . . . operate as a CREDITOR (via our natural being) and pay from Trust account via US Treasury for which we are (continued...)

9

3 (bold font omitted)),[6] (D) an Internal Revenue Service form entitled "Notice Concerning Fiduciary Relationship" listing the Clerk of this Court as Plaintiff's fiduciary, "c/o Arrow Trust Company" (id. at 4 (bold font omitted)), and (F) a document entitled "Private Bond for Set-Off, Non-Negotiable," purportedly "Issued by: Rodney-Darryl: Archer, Principal" and "Issued for: Janet L. Yellen, Secretary of the Treasury" with a "Bond Value: 100 Million USD" (id. at 6 (all-caps and bold font omitted); see also id. ("Please deposit this bond as a credit . . . as a set-off against any bills, taxes, or claims, and the like, against the Principal: Rodney-Darryl: Archer, as listed on said 'Certificate of Birth' . . . or any bills, taxes, or claims, and the like, against the Debtor: ARCHER, RODNEY DARRYL . . . 'accepted' and endorsed by the Principal: Rodney-Darryl: Archer.")).

---

[5](...continued)
the Beneficiaries of." (1:25CV74, Docket Entry 1-1 at 1; see also id. ("All debts and obligations are the responsibility of the USA Inc., operating as the United States of America.").)

[6] That joint resolution became "Public Law, 73-10, Stat. 112, 112-113 (1933), originally codified at 31 U.S.C. § 463, recodified as amended at 31 U.S.C. § 5118, [] provid[ing] for the suspension of the gold standard." Palmer v. Charleston Water Sys., No. 2:20CV3506, 2021 WL 11490999, at *3 (D.S.C. Feb. 10, 2021) (unpublished), recommendation adopted, 2021 WL 11491095 (D.S.C. Mar. 2, 2021) (unpublished); see also Bryant v. Washington Mut. Bank, 524 F. Supp. 2d 753, 759 n.9 (W.D. Va. 2007) ("House Joint Resolution 192 . . . states, in essence, that obligations requiring payment in gold . . . or in an amount in money of the United States measured thereby are against public policy, and that U.S. currency is legal tender for all debts." (internal quotation marks omitted)), aff'd, 282 F. App'x 260 (4th Cir. 2008).

10

The Second Complaint names only six Defendants: Cabarrus County Courthouse, three Cabarrus County district court judges, NC DHHS's CSE Division, and its Director (Verna Donnelly), all in their official capacities. (See 1:25CV74, Docket Entry 1 at 2; see also id. at 8 ("The claim has been amended to reduce the number of Defendants . . . .").) Akin to the First Complaint, the Second Complaint seeks relief "[p]er [S]ection 1983[ for] constitutional and statutory rights being violated by the [named] state and local officials and accomplices" (id. at 3), with a listing of federal legal provisions mirroring the First Complaint, apart from the addition of "1st Amendment – Redress of Grievances" (id.) and reference to due process and equal protection rights under the Fifth (as well as the Fourteenth) Amendment (see id.). (Compare 1:24CV531, Docket Entry 2 at 4, with 1:25CV74, Docket Entry 1 at 3.)[7] The Second Complaint repeats the First Complaint's "summary of [g]eneral [c]omplaint[s] against the [named] Defendants" (1:25CV74, Docket Entry 1 at 4), with minor alterations, such as the listing of the Fifth Amendment as another source of "rights per Due Process and Equal Protection of Laws" (id. (internal quotation marks omitted)). (Compare 1:24CV531, Docket Entry 2 at 5, with

_____

[7] Despite the fact that "Section 1983 . . . provides a method for vindicating federal constitutional and statutory rights," Jones v. Chandrasuwan, 820 F.3d 685, 691 (4th Cir. 2016) (emphasis added), the Second Complaint again identifies provisions of North Carolina law as predicates for Plaintiff's claim(s) under Section 1983 (see 1:25CV74, Docket Entry 1 at 3).

1:25CV74, Docket Entry 1 at 4.)  The two pleadings also seek the same injunctive relief (compare 1:24CV531, Docket Entry 2 at 5, 13, with 1:25CV74, Docket Entry 1 at 4, 17), although the Second Complaint raises Plaintiff's damages demand nearly ten-fold to "$2.5M" (1:25CV74, Docket Entry 1 at 18 (bold omitted)).

In developing Plaintiff's six, broad claims, the Second Complaint diverges somewhat from the First Complaint, by abandoning the General Statements and Specific Statements in favor of an "Opening Statement [with] Federal Questions . . . [followed by] Statements of Claim . . . and [a] Closing Statement of Claim" (1:25CV74, Docket Entry 1 at 4).  (Compare 1:24CV531, Docket Entry 2 at 6-12, with 1:25CV74, Docket Entry 1 at 7-17.)  First, the Second Complaint's Opening Statement recites as follows:

> IV-D Agency[8] influenced delay of shared parenting of
> father (Plaintiff) over the last 3 years in favor of
> incentivized funding from the state.  Deception,
> coercion, duress, kidnapping, extortion and obstruction
> of justice has occurred from the courts and independent

---

[8] "Title IV-D of the Social Security Act require[s] States receiving federal child-welfare funds to substantially comply with requirements designed to ensure timely payment of child support." Gonzaga Univ. v. Doe, 536 U.S. 273, 281 (2002) (internal quotation marks omitted).  "The IV-D program was set up as an intergovernmental operation involving federal, state and local governments . . . .  In most states, including North Carolina, the state department of social services . . . supervises the program and state and local enforcement agencies provide the services." Carter v. Morrow, 562 F. Supp. 311, 313 (W.D.N.C. 1983).  The Second Complaint's "allegations, liberally construed, [thus appear to] contend that the child support enforcement proceedings initiated against [Plaintiff] are illegitimate," Dawkins v. Staley, No. 1:22CV299, 2023 WL 1069745, at *2 (M.D.N.C. Jan. 27, 2023) (unpublished) (Schroeder, C.J.).

12

> agency to draw the father (Plaintiff) into and trap him
> into legalized slavery. Rights of life, liberty and
> property have been violated by a "Color of Law"
> operation. That is the purpose of the [Section] 1983
> claim.

(1:25CV74, Docket Entry 1 at 7 (bold font omitted).) The Second
Complaint then poses various "Federal Questions" (id. (bold font
and underscoring omitted)), broken into six sets each bolstered by
one or more "Fact[s]" (id. at 7-8 (bold font omitted)), all of
which focus on the alleged illegitimacy of North Carolina's child
support enforcement and adjudication system (in general and/or as
applied to Plaintiff). (See id.)

Next, under the heading "Statements of Claim" (id. at 8 (bold
font omitted)), the Second Complaint sets out these 10 "Count[s]"
(id. at 8-15 (all-caps and bold font omitted)), each supported by
a paragraph-long "Statement" (id. at 8-14 (all-caps font omitted)),
with bullet-point citations of authority (see id. at 8-15):

1) "Deprivation of Parenting Rights" (id. at 8 (all-caps and
bold font omitted));

2) "Deprivation in the Right of Contracts" (id. at 9 (all-caps
and bold font omitted));

3) "Deprivation of Privacy" (id. (all-caps and bold font
omitted));

4) "Deprivation & Violation of Due Process" (id. at 10 (all-
caps and bold font omitted));

13

5) "Deprivation of Employment" (<u>id.</u> (all-caps and bold font omitted));

6) "Defammation [sic] of Character" (<u>id.</u> at 11 (all-caps and bold font omitted));

7) "Deprivation of Legal Rights" (<u>id.</u> at 12 (all-caps and bold font omitted));

8) "Deprivation of Human Rights" (<u>id.</u> (all-caps and bold font omitted));

9) "Deprivation of Health" (<u>id.</u> at 13 (all-caps and bold font omitted)); and

10) "Deprivation of Justice" (<u>id.</u> at 14 (all-caps and bold font omitted)).

The Second Complaint thereafter concludes with its "Closing Statement of Claim" (<u>id.</u> at 16 (bold font omitted)), "stand[ing] on the following Constitutional Rights which were violated" (<u>id.</u>): "1) Right to Separation of Powers guaranteed by the US Constitution and NC Constitution. . . . 2) Right to Contract per US Constitution Article 1, Clause 10. . . . 3) Right to Private Agreements. . . . 4) Right of Immunity as a natural, living being. . . . 5) Right to Due Process." (<u>Id.</u> (bold font omitted).)

Shortly after commencing the Second Case, Plaintiff filed the instant Request, asking "the Clerk of [this] Court[] to receive the Negotiable Instrument for $405 drawn upon the Treasury (for which [Plaintiff is] a Beneficiary) to satisfy court fees." (1:25CV74,

14

Docket Entry 3 at 1; see also id. ("Registered Private Bond # RA 498 076 038 US (attached) or Exemption # 128629131 is for setoff, settlement and discharge as needed, in honor and in good faith.").) Along with the instant Request, Plaintiff (A) submitted a purported "Check Draft for $405" (id. (referring to 1:25CV74, Docket Entry 3-1)), roughly matching the item he tendered with the Second Complaint to pay the filing fee (compare 1:25CV74, Docket Entry 1-1 at 2, with 1:25CV74, Docket Entry 3-1 at 1), and (B) provided "Fiduciary Instructions" (1:25CV74, Docket Entry 3 at 2 (all-caps font omitted)), advising the Clerk to "[p]lease find attached the Check Draft (or Bill of Exchange), the processing of which will discharge the entire current amount stated on the claim therein accepted for value" (id. (underscoring omitted); see also id. ("This attached Negotiable Instrument is presented under authority of HJR-192, Public Law 73-10, UCC 3-104(c), Spencer vs. Sterling Bank, 63 Cal[.] Ap[p]. 4th 1055 (1998), Guaranty Trust Co. Of New York vs. Henwood et al, 307 US 247 (FN3), and Witkin Negotiable Instruments, Vol III (including 2002 Supplement) on the undersigned's UCC Contract Trust Account (or Bond Trust Account). . . . These are Certified Funds via Private Bond # RA 498076038 US, received 11-14-2024 at the US Treasury (see attached)." (bold font omitted) (referring to 1:25CV74, Docket Entry 3-2 at 1)).[9]

---

[9] Plaintiff also resubmitted the same type of materials he presented with the prior, attempted payment. (Compare 1:25CV74, (continued...)

DISCUSSION

To begin, "Plaintiff's claim that h[is Check Drafts/]Bill[s] of Exchange [are] legitimate negotiable instrument[s] is clearly nonsense in almost every detail." Bryant v. Washington Mut. Bank, 524 F. Supp. 2d 753, 760 (W.D. Va. 2007), aff'd, 282 F. App'x 260 (4th Cir. 2008). Specifically:

> [P]laintiff's use of th[ose C]heck [Drafts/Bills of Exchange] appear[s] to rely on frivolous legal theories under which the U.S. Government, after abandoning the gold standard, allegedly started using its citizens as collateral and set up a secret account for each citizen at birth, which citizens can redeem or reclaim to pay bills by invoking certain procedures.

Eddington v. Gulf Coast Exotic Auto, LLC, No. 1:20CV361, 2021 WL 5889881, at *3 (S.D. Miss. Dec. 13, 2021) (unpublished) (emphasis added) (internal quotation marks and ellipsis omitted); see also Parks v. Coffman, No. 1:21CV639, 2022 WL 3013022, at *2 (S.D. Ohio July 29, 2022) (unpublished) ("[The plaintiff] is claiming that, in ending the gold standard and issuing fiat currency, the government essentially took the people's gold without compensation. Thus, the government still owes the people . . . for the fair value of that missing gold. According to [the plaintiff], as the government owes him money, he can pay the filing fee to the government by writing off an equivalent amount of this pre-existing debt. Suffice to say that, if the [c]ourt correctly understands [the plaintiff's]

---

[9](...continued)
Docket Entry 1-1 at 1, 3-5, with 1:25CV74, Docket Entry 3-2 at 2, 1:25CV74, Docket Entry 3-3, and 1:25CV74, Docket Entry 3-4.)

16

argument, the [c]ourt rejects it as frivolous." (internal quotation marks omitted)), appeal dismissed, No. 22-3724, 2022 WL 18832273 (6th Cir. Oct. 27, 2022) (unpublished).

"Most importantly, the alleged legal bases for [Plaintiff's theory], House Joint Resolution 192 and [the] *Guaranty Trust* [decision], address nothing more than the U.S. monetary shift away from the gold standard and provide absolutely no support for h[is] position." Bryant, 524 F. Supp. 2d at 760 (internal citation omitted); see also Palmer v. Charleston Water Sys., No. 2:20CV3506, 2021 WL 11490999, at *4 (D.S.C. Feb. 10, 2021) (unpublished) ("Other litigants have argued that HJR-192, among other things, requires the government to discharge any personal debts. Unsurprisingly, debt relief . . . based on HJR-192 ha[s] been rejected by federal courts . . . ."), recommendation adopted, 2021 WL 11491095 (D.S.C. Mar. 2, 2021) (unpublished).

Plaintiff's references to the Uniform Commercial Code ("UCC"), trust accounts, and private bonds he supposedly sent to the United States Treasury similarly underscore the worthlessness of his Check Drafts/Bills of Exchange. See, e.g., Larkins v. Montgomery Cnty. Cir. Ct., No. 2:19CV281, 2020 WL 2744116, at *3 (M.D. Ala. Apr. 21, 2020) (unpublished) (rejecting "theory that Public Law 73-10[, which enacted HJR-192,] and UCC 3-104 somehow allow [the plaintiff] to satisfy his debt to [a state court] by converting a demand for payment [on an alleged private bond on file with the United States

17

Treasury] into a money order"), recommendation adopted, 2020 WL 2739821 (M.D. Ala. May 26, 2020) (unpublished); Turnbough v. Thaler, No. 6:11CV336, 2011 WL 4592379, at *2 (E.D. Tex. Aug. 13, 2011) (unpublished) (concluding that the plaintiff could not rely on "indemnity bond" and "UCC Financing Statement, apparently addressed to the Treasury Department," to pay filing fee, because those "document[s were] item[s] of his own creation, and as such ha[d] no legal meaning or effect" (internal quotation marks omitted)), recommendation adopted, 2011 WL 4592361 (E.D. Tex. Sept. 30, 2011) (unpublished); Lemeur v. Vaughn, Civ. No. 09-5257, 2010 WL 4116829, at *2 (W.D. Ark. Sept. 10, 2010) (unpublished) ("[The plaintiff's] attempt to pay the filing fee by reference to HJR 192 and the Uniform Commercial Code is meritless."), recommendation adopted, 2010 WL 4136987 (W.D. Ark. Oct. 19, 2010) (unpublished); Joyner v. Fish, No. 7:08CV359, 2008 WL 2646691, at *1 n.1 (W.D. Va. July 3, 2008) (unpublished) (treating "submission" of "document purport[ing] to be a 'BOND' . . . payable 'IN THE SUM CERTAIN AMOUNT' of $350.00 . . . against [his] Trust Fund Account" with "numbers that are labeled as 'Exemption Identification,' 'UCC Contract Trust Account,' and 'Registration Number,'" above "signature line [] identif[ying him] as a purported 'Secured Party/ Creditor,'" as "a frivolous filing" (internal brackets omitted)).[10]

---

[10] As noted in the preceding section, Plaintiff also "presented [his Check Drafts/Bills of Exchange] under authority of . . .
(continued...)

To sum up, "Plaintiff's purported [Check Drafts/B]ill[s] of [E]xchange [are] document[s] of his own creation and ha[ve] no value, and thus cannot be used to satisfy the statutory filing fee obligation." Charles v. Castro, No. 5:20CV42, 2020 WL 5670110, at *2 (E.D. Tex. Sept. 24, 2020) (unpublished) (internal quotation marks omitted); see also St. Thomas v. Post 67 Ohio State Highway Patrol, No. 5:24CV2065, 2025 WL 507757, at *2 (N.D. Ohio Feb. 14, 2025) (unpublished) ("The [c]ourt does not accept bills of exchange, or private registered set off bonds as payment for filing

---

[10](...continued)
Spencer vs. Sterling Bank, 63 Cal[.] Ap[p]. 4th 1055 (1998), . . . and Witkin Negotiable Instruments, Vol III (including the 2002 Supplement)" (1:25CV74, Docket Entry 3 at 2). That decision from California's intermediate appellate court does not permit litigants in North Carolina to pay filing fees with check drafts/bills of exchange drawn on private bonds sent to the United States Treasury; rather, it examines California law on the subject of "whether a check indorsed 'for deposit only' without further limitation . . . can be deposited only into the indorser's unidentified account or whether it can be deposited into anybody's account at any bank." Spencer, 63 Cal. App. 4th at 1056-57. The other citation appears to refer to a two-decade-plus-old edition of one of "the works of the late Bernard Witkin, whose incisive summaries of California law have found recognition through repeated citation by California courts and lawyers," Judith D. Fischer, Bareheaded and Barefaced Counsel: Courts React to Unprofessionalism in Lawyers' Papers, 31 Suffolk U.L. Rev. 1, 17 n.136 (1997); see also Woolridge v. J.F.L. Elec., Inc., 96 Cal. App. 4th Supp. 52, 59 (2002) (citing "3 Witkin, Summary of Cal. Law (2001 supp.) Negotiable Instruments"). As concerns Plaintiff's proffer of the validity of his Check Drafts/Bills of Exchange, a review of Witkin's negotiable instruments volume confirms that the "citation[] to Witkin's treatise is not helpful to [Plaintiff's] argument," Knickerbocker v. City of Stockton, 199 Cal. App. 3d 235, 241 (1988). And, "[e]ven if Witkin did support [Plaintiff's] argument, Witkin is a treatise and consequently not binding law." Heller v. Pillsbury Madison & Sutro, 50 Cal. App. 4th 1367, 1393 (1996).

19

fees."); <u>Bryant</u>, 524 F. Supp. 2d at 760 (concluding that, by submitting bill of exchange purportedly backed by funds redeemable from the United States Treasury, the plaintiff "did not tender payment, but rather a worthless piece of paper").[11]

---

[11] Indeed, by presenting those fictitious Check Drafts/Bills of Exchange and related instructions to the Clerk to pay the filing fee, Plaintiff may have committed federal crimes. <u>See</u> <u>United States v. Dilley</u>, No. 1:08CR37, 2009 WL 1564389, at *1-2 (N.D. Ind. June 3, 2009) (unpublished) ("[The defendant] was charged . . . with presenting fictitious documents in violation of 18 U.S.C. § 514(a)(2) . . . . The offense conduct in this case stems from a . . . theory commonly known as 'redemption' . . . . According to the theory, the United States government went bankrupt in 1933 when it suspended the gold standard . . . . Thus, the theory claims, the United States pledges its current and future citizens as collateral and has accounts linked to the birth certificate number of each citizen. . . . Litigants espousing redemption theory claim that this account is a valuable asset . . . they can gain control over . . . by making particular UCC filings. Once they have made these UCC filings, litigants relying on this theory claim that they can execute a promissory note, bill of exchange, or 'sight draft' drawn on their birth certificate account at the United States Treasury and use the note as cash. This is precisely what [the defendant] attempted to do when he sought to settle various debts . . . by drafting promissory notes and private bonds drawn on the United States Treasury . . . . [N]one of the debtors accepted the documents [he] presented . . . . After a two day jury trial, a jury convicted [him] . . . of presenting fictitious documents." (internal citations omitted)); <u>see also</u> <u>Bryant</u>, 524 F. Supp. 2d at 760 ("tak[ing] judicial notice of the fact that [a defendant], who[ promoted] theories and advice regarding 'redemption' and [b]ills of [e]xchange . . ., was recently convicted . . . of criminal fraud charges related to the passing of [b]ills of [e]xchange"); 18 U.S.C. § 1001(a) ("Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the . . . judicial branch of the Government of the United States, knowingly and willfully – (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years

(continued...)

Turning to the review of the First Complaint under Section 1915(e)(2)(B) and of the Second Complaint under the Court's "broad inherent power sua sponte to dismiss an action . . . which is frivolous, vexatious, or brought in bad faith," Brown, 2011 WL 883917, at *1 (italics omitted), the Court notes first that Section 1983 "imposes liability only where a person acts under color of a state statute, ordinance, regulation, custom, or usage," Richardson v. McKnight, 521 U.S. 399, 403 (1997) (emphasis added) (internal quotation marks omitted), "to deprive individuals of their federally guaranteed rights," id. (internal quotation marks omitted); see also White Coat Waste Project v. Greater Richmond Transit Co., 35 F.4th 179, 189-90 (4th Cir. 2022) ("[Section 1983] applies, by its terms, only to a 'person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory[,]' deprives a person of a constitutional or statutory right, privilege, or immunity." (emphasis added) (quoting 42 U.S.C. § 1983)). As documented in the preceding section, in both the First and Second Complaints, "Plaintiff names as a Defendant the [Cabarrus] County Courthouse. However, a courthouse is not a 'person' subject to suit under § 1983." Elmore v. Mecklenburg Cnty. Courthouse, No. 3:23CV36, 2023 WL 5539023, at *2 (W.D.N.C.

---

[11] (...continued)
. . . or both."); 18 U.S.C. § 1001(b) (excluding from reach of Subsection 1001(a) "documents submitted by [a] party . . . to a judge or magistrate in that proceeding," but not documents submitted to clerk to pay filing fee).

Aug. 28, 2023) (unpublished), aff'd, No. 23-6953, 2023 WL 8728588 (4th Cir. Dec. 19, 2023) (unpublished); accord, e.g., Smalls v. Maryland, No. 22CV1095, 2022 WL 16839044, at *3 (D. Md. Nov. 9, 2022) (unpublished); Gibbs v. Fayette Cnty. Courthouse, No. 2:20CV115, 2020 WL 4207557, at *1 (S.D. W. Va. July 22, 2020) (unpublished); see also Jones v. Lexington Cnty. Det. Ctr., 586 F. Supp. 2d 444, 451 (D.S.C. 2008) ("Inanimate objects – such as buildings, facilities, and grounds – do not act under color of state law."), recommendation adopted, id. at 450. "Thus, the undersigned [Magistrate Judge] recommends that [P]laintiff's claim[s] against . . . the [Cabarrus County] Courthouse be dismissed as frivolous and for failure to state a claim upon which relief may be granted." Bey v. Greenfield MHP Holdings LLC, No. 4:24CV32, 2024 WL 5396770, at *6 (E.D.N.C. Oct. 10, 2024) (unpublished) (all-caps font omitted), recommendation adopted as modified, 2025 WL 40861 (E.D.N.C. Jan. 7, 2025) (unpublished).

Plaintiff's claims against the Cabarrus County District Court Judge-Defendants also cannot proceed. "A long line of th[e Supreme] Court's precedents acknowledges that, generally, a judge is immune from a suit for money damages." Mireles v. Waco, 502 U.S. 9, 9 (1991); see also id. at 11 ("[J]udicial immunity is an immunity from suit, not just from ultimate assessment of damages."). Judicial immunity applies broadly to judicial officers' "judicial acts, even when such acts are in excess of

22

their jurisdiction, and are alleged to have been done maliciously or corruptly." Bradley v. Fisher, 80 U.S. 335, 351 (1871); see also Mireles, 502 U.S. at 11 ("[J]udicial immunity is not overcome by allegations of bad faith or malice . . . ."). "[T]his doctrine of judicial immunity [i]s applicable in suits under . . . § 1983 . . . ." Stump v. Sparkman, 435 U.S. 349, 356 (1978). Additionally, Section 1983 provides "that[,] in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983 (emphasis added); see also Lepelletier v. Tran, 633 F. App'x 126, 127 (4th Cir. 2016) ("[C]laims seeking injunctive relief against a sitting state court judge for actions taken in his judicial capacity also [a]re barred by the plain language of 42 U.S.C. § 1983 (2012).").[12]

"[Judicial] immunity is overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions . . . taken in the complete absence of all jurisdiction." Mireles, 502 U.S. at 11-12 (internal citations and italics omitted). As to the latter criterion, "the scope of the judge's jurisdiction must

---

[12] Plaintiff has not alleged that "a declaratory decree was violated or declaratory relief was unavailable," 42 U.S.C. § 1983. (See 1:24CV531, Docket Entry 2; 1:25CV74, Docket Entry 1.)

23

be construed broadly where the issue is the immunity of the judge. A judge will not be deprived of immunity because the action he [or she] took . . . was in excess of his [or her] authority . . . ." Stump, 435 U.S. at 356; see also id. at 357 n.7 ("illustrat[ing] the distinction between lack of jurisdiction and excess of jurisdiction with the following examples: if a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of jurisdiction . . .; on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune"). Coordinately, "the factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his [or her] judicial capacity." Id. at 362 (italics omitted).

The allegations against the Cabarrus County District Court Judge-Defendants in the First and Second Complaints all concern their rulings in and oversight of child custody/support case(s) (see 1:24CV531, Docket Entry 2 at 6-12; 1:25CV74, Docket Entry 1 at 8-14), which qualify as "paradigmatic judicial acts involved in resolving disputes between parties who have invoked the jurisdiction of a court," Forrester v. White, 484 U.S. 219, 227 (1988). See, e.g., Robins v. Coll, 523 F. App'x 854, 855-56 (3d

24

Cir. 2013) ("[The plaintiff] alleged violations of his First Amendment and Fourteenth Amendment rights [by two judge-defendants] throughout child support proceedings . . . . Assessing child support and issuing court orders are routine, typical functions of judges . . . . Thus, [the plaintiff's] allegations are insufficient to overcome [the judge-defendants'] judicial immunity."); Washington v. Coward, No. 4:24CV4, 2024 WL 4376339, at *2 (E.D.N.C. Mar. 5, 2024) (unpublished) ("The complained-of conduct by these judge[-defendants] relates to the performance of judicial acts in the child custody proceeding for which they are entitled to absolute judicial immunity."), recommendation adopted, 2024 WL 4375756 (E.D.N.C. Oct. 2, 2024) (unpublished); Warren v. Bray, No. 1:13CV1144, 2014 WL 3404962, at *5 (M.D.N.C. July 10, 2014) (Webster, M.J.) (deeming claims "barred by absolute judicial immunity" where "[t]he plaintiff's allegations against [North Carolina district court j]udge [] concern[ed] judicial actions she performed while presiding over [child support and custody] matters"), recommendation adopted, slip op. (M.D.N.C. Aug. 5, 2014) (Beaty, S.J.); see also Higdon v. Tusan, 746 F. App'x 805, 812 (11th Cir. 2018) ("[E]ven ministerial acts involved in managing a case's docket are functions normally performed by a judge, and, thus, within the contemplated protection of judicial immunity." (internal quotation marks omitted)).

25

The Second Complaint attempts to overcome this judicial immunity bar by asserting that the Cabarrus County District Court Judge-Defendants "are bonded per 45 UC 302.19 by the IV-D agency and lose all immunity stepping down from their State capacity to a private contract position." (1:25CV74, Docket Entry 1 at 14; see also, e.g., id. at 7 ("If there are mandatory and outlined guidelines for . . . Administrative Judges and CSE (Child Support Enforcement) Agents, and they are intentionally not followed under their private contracts, don't the judges lose immunity . . . .?"), 8 (alleging that two Cabarrus County District Court Judge-Defendants "have presided over both child custody in judicial capacity and IV-D hearings in administrative capacity" (internal parentheses omitted)).)[13]  In other words, Plaintiff (like prior litigants who have pursued such claims) apparently would have the Court treat the Cabarrus County District Court Judge-Defendants "not a[s] judge[s], but a[s] contractor[s] of [Section] IV-D and thus[ ] not entitled to judicial immunity." Clark v. Region 4 IV-D Agency, No. 1:23CV2594, 2024 WL 1396648, at *3 (N.D. Ga. Mar. 31, 2024) (unpublished) (internal quotation marks omitted).

---

[13] At one point, the First Complaint also asserts that "[t]here was no separation of administration and judicial power." (1:24CV531, Docket Entry 2 at 6.)  But that bald assertion does not relate to any alleged act (judicial or otherwise) by a Cabarrus County District Court Judge-Defendant; rather, it pertains to Plaintiff's receipt of a garnishment form with "no judges [sic] signature on [the] form, only the CSE [a]gents [sic]." (Id.)

26

The Court should follow the lead of other courts in rejecting this line of attack on the work of state judges in child support cases. See, e.g., id. ("State judges are not officers of any agency. They do not perform 'contract' work. They are members of the state judiciary and put simply, are judges, not contractors. . . . Accordingly, the [c]ourt holds that [the judge-defendant who handled the plaintiff's child support case] is immune from suit . . . ."); Horan v. Coen, No. 1:22CV2017, 2023 WL 5345547, at *2-3 (D.S.C. Aug. 21, 2023) (unpublished) (dismissing "argu[ment that] judicial immunity is not applicable here because . . . child support . . . is not a judicial function, but an administrative function on behalf of the [s]tate as a means to self-profit" (internal brackets and quotation marks omitted)); Lockley v. Barredo, No. 3:20CV10, 2020 WL 1258766, at *1-2 (W.D. Va. Mar. 16, 2020) (unpublished) ("[The complaint] references Title IV-D of the Social Security Act, which requires states to provide child support enforcement services in return for receiving federal funding for public assistance. . . . [The] complaint includes the [allegation that the judge-defendant] . . . is a IV-D contractor. . . . [I]t is clear from the complaint that [the plaintiff's] claim against [the judge-defendant] is based on acts taken in [his] judicial capacity. . . . Even if [the j]udge[-defendant] somehow erred in exercising his judicial authority, he is still entitled to absolute immunity." (internal citation and quotation marks omitted)).

27

Nor do the allegations in the First or Second Complaints support a finding that the Cabarrus County District Court Judge-Defendants took any actions "in the complete absence of all jurisdiction," Mireles, 502 U.S. at 12. To the contrary, Plaintiff has made only (A) conclusory assertions that they "made judgments lacking Subject-Matter and Personal Jurisdiction" (1:25CV74, Docket Entry 1 at 10; see also, e.g., 1:24CV531, Docket Entry 2 at 11 (grousing about "[r]uling[s] on [] matter[s] with no subject-matter jurisdiction")), and (B) frivolous challenges to their jurisdiction over him and/or his child custody/support case(s) (see 1:25CV74, Docket Entry 1 at 9 ("Being a Trust matter, the court did not have original subject matter jurisdiction, nor personal jurisdiction as the legal fiction RODNEY DARRYL ARCHER was a debtor to the Trust via UCC 1 filing and written agreement dated before court hearings in July 2022. All judges listed herein acted outside their jurisdiction from the beginning, therefore invalid court orders were signed . . . ."); see also, e.g., 1:24CV531, Docket Entry 2 at 9 (alleging that "proceeding involving a Trust belong [sic] in the Superior Court for proper subject-matter jurisdiction" and that, by "disregard[ing his] Special Appearance notice," entry of "criminal contempt of court order against Plaintiff violated his state civil rights to contest jurisdiction")).

Plainly stated, "[r]esolving disputes that arise in family law matters are at the core of the [Cabarrus County District Court

Judge-Defendants'] judicial function and thus [they] did not act in clear absence of all jurisdiction. [Therefore, Plaintiff's] claims against [them] are barred by judicial immunity and should be dismissed." Norman v. Hopkins, No. 5:18CV343, 2019 WL 1281380, at *3 (E.D.N.C. Jan. 10, 2019) (unpublished) (internal citation omitted), recommendation adopted, 2019 WL 1877293 (E.D.N.C. Apr. 26, 2019) (unpublished), appeal dismissed, 777 F. App'x 666 (4th Cir. 2019); see also Chu v. Griffith, 771 F.2d 79, 81 (4th Cir. 1985) ("[I]t is immaterial that [the judge-defendant's] challenged judicial act may have been unauthorized by the laws which govern his conduct. If he exceeds his authority, his action is subject to correction on appeal or other authorized review, but it does not expose him to a claim for damages in a private action, or put him to the trouble and expense of defending such an action."); Horan, 2023 WL 5345547, at *3 ("[E]ven assuming [the p]laintiff is correct that there was some fatal flaw in a state court order enforced by [the judge-d]efendants . . ., that does not void their entitlement to judicial immunity."); Warren, 2014 WL 3404962, at *5 (citing North Carolina statutes granting state district courts "original, exclusive, and continuing jurisdiction over child custody and support actions" and concluding that, "in presiding over these matters and entering orders, [the j]udge[-defendant] properly exercised jurisdiction," such that "[the p]laintiff's claims [we]re barred by absolute judicial immunity").

29

Moreover, "the absolute immunity of the [Cabarrus County District Court Judge-D]efendant[s] would justify the dismissal of [the] claim[s against them] as frivolous." Clark v. State of Ga. Pardons & Paroles Bd., 915 F.2d 636, 640 n.2 (11th Cir. 1990); see also Hamilton v. Simpson, 38 F. App'x 255, 256 (6th Cir. 2002) ("The district court properly dismissed [the] complaint as frivolous because [the] claims lack an arguable or rational basis in law inasmuch as the [judge-]defendants are clearly entitled to immunity."); Evans v. Allbrooks, No. 89-7061, 884 F.2d 1388 (table), 1989 WL 100776, at *1 (4th Cir. Aug. 28, 1989) (unpublished) ("[The plaintiff's] claims are wholly frivolous – the state judge[-defendant] has absolute immunity . . . ."); Clay v. Yates, 809 F. Supp. 417, 427 (E.D. Va. 1992) ("[The] claims against . . . [the state j]udge[-defendant] fall squarely within the definition of legal frivolity . . . because it is clear that [he is] immune from suit." (internal quotation marks omitted)), aff'd, No. 93-6534, 36 F.3d 1091 (table), 1994 WL 520975 (4th Cir. Sept. 23, 1994) (unpublished). In addition, "[a] review of the [First and Second] Complaint[s] reveals that . . . [P]laintiff is a disgruntled litigant who seeks to relitigate h[is s]tate [child support] and custody case[s] in this forum, repackaged as claims of constitutional violations." J.B. v. County of Howard, Civ. Action No. 14-3752, 2015 WL 306705, at *10 (D. Md. Jan. 21, 2015) (unpublished). This case thus represents "an obvious attempt at

forum shopping, involves overlapping issues of fact with the domestic case in [s]tate court, and would create unnecessary entanglement between the [s]tate and federal courts." Id. at *9; see also id. at *10 ("[T]he proper method of challenging rulings or actions by [a] state court is by appeal within the state system . . . ." (internal quotation marks and ellipsis omitted)).

Accordingly, the "claims against the [Cabarrus County District Court J]udge[-Defendants not only] are patently frivolous," id., but also "malicious," 28 U.S.C. § 1915(e)(2)(B)(i), and "vexatious," Brown, 2011 WL 883917, at *1. See McBrearty v. Koji, 348 F. App'x 437, 439-40 (11th Cir. 2009) (affirming dismissal of claims against "judge[-defendants] because [the] claims against them were frivolous and vexatious" as "allegations against the[m] stem from [their] rulings and acts" for which they "were entitled to judicial immunity"); Long Jaw v. Deschamps, No. CV 10-137, 2011 WL 474340, at *1 (D. Mont. Feb. 4, 2011) (unpublished) (ruling claims "frivolous and malicious as brought against [the j]udge-defendant] given the clear applicability of judicial immunity"); see also In re Martin-Trigona, 9 F.3d 226, 230 (2d Cir. 1993) ("Making judges defendants in a repetitive series of lawsuits whenever a judge rules against a litigant is [] a tactic employed by many vexatious litigants . . . ."); Cain v. Virginia, 982 F. Supp. 1132, 1136 (E.D. Va. 1997) (deeming actions "malicious[]"

31

if they "import a wish to vex . . . another" (internal brackets and quotation marks omitted)).

The Court likewise should dismiss Plaintiff's claims against the CSE Division of NC DHHS, its employees (Defendants Tillman and Stapula), and its Director (Defendant Donnelly) as frivolous, i.e., "lack[ing] an arguable basis [] in law," Neitzke, 490 U.S. at 325, for multiple reasons. First, "[NC] DHHS is a statutorily-created principal department contained within the executive branch of the State of North Carolina." Quinn v. North Carolina Dep't of Health and Hum. Servs., No. 3:20CV169, 2020 WL 4468728, at *2 (W.D.N.C. Aug. 4, 2020) (unpublished). As a result, "*Will* [*v. Michigan Dep't of State Police*, 491 U.S. 58 (1989),] prohibits a § 1983 action against th[at state d]epartment." Manning v. South Carolina Dep't of Highway & Pub. Transp., 914 F.2d 44, 48 (4th Cir. 1990); see also Will, 491 U.S. at 65 ("conclu[ding] that a State is not a 'person' within the meaning of § 1983"), 70 (extending that holding to "governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes"); Clark v. Maryland Dep't of Pub. Safety & Corr. Servs., 316 F. App'x 279, 282 (4th Cir. 2009) ("[M]unicipalities are 'persons' amenable to suit under § 1983, [but] state departments and agencies considered to be 'arms of the state' are not." (internal brackets and citations omitted)); Weller v. Department of Soc. Servs., 901 F.2d 387, 396 (4th Cir. 1990) ("not[ing] the existence of jurisdiction . . . for a claim under

32

[Section] 1983 only against those defendants who are not state agencies"); Quinn, 2020 WL 4468728, at *2 ("[A]ny claim against [NC] DHHS is a claim against the State of North Carolina."); Stewart v. North Carolina Dep't of Health & Hum. Servs., No. 5:06CV29, 2006 WL 8438814, at *5 (E.D.N.C. July 14, 2006) (unpublished) (ruling "[NC] DHHS . . . [is] state agenc[y] entitled to Eleventh Amendment immunity").

Second, Plaintiff has sued Defendants Tillman, Stapula, and Donnelly each "[i]n [her o]fficial [c]apacity" with the CSE Division of "NC [D]HHS." (1:24CV531, Docket Entry 2 at 3; 1:25CV74, Docket Entry 1 at 2; see also 1:24CV531, Docket Entry 2 at 1 (placing parenthetical "(IOC)" beside names of Defendants Tillman and Stapula in caption with explanatory note of "IOC – In Official Capacity"), 3 (listing Tillman and Stapula together with CSE Division of NC DHHS as Defendants and describing them jointly as "Agency and Agents of CSE"); 1:25CV74, Docket Entry 1 at 1 (placing parenthetical "(IOC)" beside name of Defendant Donnelly in caption with explanatory note of "IOC – In Official Capacity"), 2 (listing Donnelly together with CSE Division of NC DHHS as Defendants and describing her as "Director of Child Support Services").) "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." Will, 491 U.S. at 71

33

(internal citation omitted). Consistent with that understanding, the Supreme Court has "h[e]ld that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." Id. "Under Will, therefore, Plaintiff's § 1983 claim[s] for money damages against the[se ] Defendants acting in their official capacities must be dismissed . . . ." Mitchell v. Winston-Salem State Univ., No. 1:19CV130, 2020 WL 1516537, at *6 (M.D.N.C. Mar. 30, 2020) (unpublished) (Osteen, J.).[14]

"Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." Will, 491 U.S. at 71 n.10 (internal quotation marks omitted). Any such claims here, however, cannot proceed, because Plaintiff has not alleged facts showing that "execution of a [state] policy or custom . . . inflict[ed any alleged] injury," Collins v. City of Harker Heights, 503 U.S. 115, 121 (1992) (internal quotation marks omitted); "instead[, he has] recount[ed] only his own personal experiences," Harris v. Guice, No. 1:13CV268, 2015 WL 1401549, at *4 (M.D.N.C. Mar. 26, 2015)

---

[14] This authority also precludes any claim against the State of North Carolina as the employer of the Cabarrus County District Court Judge-Defendants (and real party in interest to any official capacity claim against them). See, e.g., Warren, 2014 WL 3404962, at *5 ("[A] District Court Judge in North Carolina[] . . . is a state judicial official . . . . By filing a lawsuit against [such a judge] in her official capacity, the plaintiff is in fact filing a lawsuit against the State of North Carolina. Accordingly, [any] claims for monetary damages are barred . . . .").

34

(unpublished) (Peake, M.J.) (recommending, even as to "request [for] injunctive relief," that "official capacity claims against [d]efendant[-state employees] should be dismissed"), <u>recommendation adopted</u>, 2015 WL 2089691 (M.D.N.C. May 4, 2015) (unpublished) (Beaty, S.J.). (<u>See</u> 1:24CV531, Docket Entry 2 at 6-12; 1:25CV74, Docket Entry 1 at 7-17.) Hence, as to Defendants Tillman, Stapula, and Donnelly, the First and Second Complaints (even if limited solely to injunctive relief) each "<u>clearly</u> fails to state a federal claim upon which relief can be granted," <u>Dawkins v. Staley</u>, No. 1:22CV299, 2023 WL 1069745, at *6 (M.D.N.C. Jan. 27, 2023) (unpublished) (Schroeder, J.) (emphasis added), "because [each] complaint is completely devoid of any allegations of a [state] policy or custom that caused [Plaintiff's] injury," <u>id.</u>; <u>see also id.</u> (explaining that said defect requires dismissal of <u>both</u> claims against governmental entity <u>and</u> "same claims against [its employee] in her official capacity").[15]

---

[15] Given the obvious nature of the above-discussed defects, the Court may dismiss the Section 1983 claim(s) against NC DHHS's CSE Division, its employees, and its director as "[l]egally frivolous claims [] based on an indisputably meritless legal theory and . . . a legal interest which clearly does not exist." <u>Adams v. Rice</u>, 40 F.3d 72, 75 (4th Cir. 1994) (internal quotation marks omitted). The Section 1983 claim(s) against Defendants Tillman and Stapula in the First Complaint and Defendant Donnelly in the Second Complaint would fare no better if treated as individual-capacity claims, as (A) the former pleading lacks sufficient factual matter to establish any violation of Plaintiff's federal rights by Defendants Tillman and Stapula (<u>see</u> 1:24CV531, Docket Entry 2 at 6-10 (failing to reference Defendants Tillman and Stapula by name in General Statements section), 11 (alleging in Specific Statements (continued...)

35

The preceding analysis disposes of the Section 1983 claim(s) against all six Defendants in the Second Complaint and, as to the Section 1983 claim(s) in the First Complaint, leaves only three Defendants: Altheia V. Anthony, the "Matriarch Parent" (1:24CV531, Docket Entry 2 at 3; see also id. at 11 (describing Defendant Anthony as "Mother of Child")); her attorney, Benjamin Baucom (see id. at 3); and H. Jay White Sr., an "[a]ttorney for Cabarrus County CSE" (id.). As concerns Defendant Anthony, the first General Statement in the First Complaint – labeled "Fraud, no Due Process and Equal Protection" (id. at 6 (all-caps and bold font omitted)) – appears to object to her role in the calculation of her income and Plaintiff's income, including by failing to provide "full

---

[15](...continued)
section only that Defendant Tillman's "[s]ignature was placed on IWO form without active court order to back withholding request on 8/11/2023" before "[o]rder was signed on 10/30/2023" and that Defendant Stapula "[d]id not get actual discovery of [Matriarch Parent]," but instead "[u]sed online figure vs. actual paystubs of [Matriarch Parent]," and "[p]repared $84K and $125K worksheets 4 days prior to 7/31/2024 to impute income on [] Plaintiff")), and (B) the latter pleading does not mention Defendant Donnelly's name (see 1:25CV74, Docket Entry 1 at 1-20). See Dawkins, 2023 WL 1069745, at *6 ("[T]he § 1983 claims made against [the county social services employee-defendant] in her individual capacity also fail because [the plaintiff's] factual allegations do not give rise to the reasonable inference that [she] violated his constitutional rights. Aside from the vague and cursory suggestion that [she] fraudulently filed the motion for order to show cause in [his] child custody case, the complaint is devoid of any factual allegations describing what occurred, how [she] caused [his] injury, and what constitutional harm [he] incurred. A well-pleaded complaint, however, must offer more than labels and conclusions, or naked assertions devoid of further factual enhancement." (internal brackets, citation, and quotation marks omitted)).

discovery" (id.) and by "agree[ing] under oath" (id.). Relatedly, the First Complaint's third General Statement, i.e., "Collussion [sic] for Financial Harm" (id. at 7 (all-caps and bold font omitted)), alleges:

> On [various] dates [from] 7/18/23 . . . [through] 6/2/24[, ] Plaintiff pleaded with [Defendant Anthony] via text to drop the court hearings of child support and child custody and to deal with their child affairs privately. It was requested that [] Plaintiff would share parenting 50/50 and take care of child financially, etc. on his side and she would do the same on her side. The $300 per month temporary order was being paid from October 2022 and March to August 2023 out of coercion and duress. She requested for Child Support Enforcement (CSE) to go after more money from [] Plaintiff in March 2023. When the amount ballooned to $1432 on 7/31/2023, [] Plaintiff pleaded with [Defendant Anthony] that the amount wasn't accurate, realistic or affordable . . . . [She] said nothing, "tacit acquiescence". She has caused harassment from the court, coercion, incarceration, duress, time away from contractual duties, missed visits with daughter, gas driving back and forth to Cabarrus County around 60 miles over 50 times in 2 years plus. The only concern and interest has been collecting child support . . . .

(Id. (stray comma omitted).)

In the seventh and eighth General Statements in the First Complaint, both entitled "Deprivation of Parental Rights" (id. at 9 (all-caps and bold font omitted)), Plaintiff lodged these further allegations against Defendants Anthony and Baucom:

1) "[f]or 2.5 years, [they and two Cabarrus County District Court Judge-Defendants] continued the child custody case from one date to the other" (id.; see also id. ("There has [sic] been 10 appearances in court or mediation and only two hearings . . . ."));

37

2) "[b]ecause [Defendant] Anthony did not allow alone time or overnights of the child with Plaintiff from birth . . ., he was put on a progression plan of supervised visits . . . which lasted 13 months without consent" (id.), followed by "unsupervised visits of 4 hours [on] Saturday and Sunday every other week [which] was to be reviewed in 4 months . . . for more time" (id.), but "[t]hat did not happen" (id.);

3) "[d]uring mediation in November 2023, [Defendant] Anthony did not allow any more time for Plaintiff to spend with child" (id.; see also id. ("[Plaintiff] has been denied proper time with his daughter since February 2023 . . . ."));

4) in advance of a "custody hearing . . . [in] July 2024 [] a trap [wa]s laid based on a frivolous Motion for Contempt filed by [Defendants Anthony] and [] Baucom . . . to block parenting rights" (id.);

5) "[p]arental alienation and harassment has been demonstrated by [Defendant] Anthony regarding made up stories regarding the child [sic] safety or her [c]ontempt of [c]ourt complaint" (id.);

6) "[Defendant] Anthony has purposely provided distracting back-grounds, loud music or entertainment devices[ and] placed camera to ceiling or door to disrupt uninterrupted time between Plaintiff and daughter" (id. at 10);

7) "[Defendant Anthony] has not corrected inappropriate child behavior when child does not say hi or bye or when closing the zoom abruptly" (id.);

8) "[Defendant] Anthony has said several times in front of [the child] to [] Plaintiff that 'she doesn't want to talk to you'" (id.); and

9) "requested changes for [] Plaintiff are met with a 'take or leave it attitude'" (id.; see also id. (giving examples of accommodation requests by Plaintiff that Defendant Anthony has denied or has failed to address)).[16]

"To state a claim for relief in an action brought under § 1983, [Plaintiff] must establish that [he was] deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999) (emphasis added). "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter

---

[16] The ninth General Statement in the First Complaint ascribes liability to Defendants Anthony and Baucom, along with five other Defendants, for "causing [Plaintiff] stress related health problems" (1:24CV531, Docket Entry 2 at 10 (capitalization and bold font omitted)), but without making any discrete factual allegations about any Defendant's conduct (see id.). In equally undeveloped fashion, the First Complaint's Specific Statement for Defendant Anthony baldly asserts that she "[c]ause[d p]arental [a]lienation and CSE [h]arassment" (id. at 11), "[d]epriv[ed Plaintiff] of [p]arental [r]ights" (id.), and engaged in "[c]ollusion for [f]inancial [h]arm" (id.). None of the Specific Statements in the First Complaint target Defendant Baucom. (See id. at 11-12.)

39

how discriminatory or wrongful." Id. at 50 (internal citation and quotation marks omitted); see also id. (equating that element to "state-action requirement of the Fourteenth Amendment"). To satisfy this element, Plaintiff must show "that the party charged with the deprivation [of federal rights is] a person who may fairly be said to be a state actor." Id. (internal quotation marks omitted). "Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 936 (1982); see also id. at 936-37 (emphasizing duty of "courts to respect the limits of their own power as directed against . . . private interests").

Here, Defendants Anthony and Baucom "are private parties, and Plaintiff has alleged no facts demonstrating that [they] should be viewed as state actors." McIndoo v. Broward Cnty., 750 F. App'x 816, 819-20 (11th Cir. 2018) (affirming dismissal of Section 1983 claim by one parent against another pertaining to state court child custody dispute). More particularly, the allegations in the First Complaint (detailed above) confirm that Defendant Anthony "is a private individual who took legal measures to obtain [custody of and] child support for her and [Plaintiff's child]. [Defendant Baucom] is merely the lawyer who represented [Defendant Anthony] in th[ose] legal proceedings. Quite simply, these [D]efendants are not clothed with the authority of state law." Joynes v. Meconi,

40

Civ. Action No. 05-332, 2006 WL 2819762, at *11 (D. Del. Sept. 30, 2006) (unpublished) (internal quotation marks omitted); see also Davis v. Self, 547 F. App'x 927, 933-34 (11th Cir. 2013) ("The district court correctly ruled that [the plaintiff's] allegations against [various] private party defendants . . . do not satisfy any of the recognized exceptions that permit private parties to be considered state actors for the purposes of § 1983. . . . [Two of the defendants] are simply private attorneys acting on behalf of their client, [the third] defendant [], who is a private citizen enmeshed in a bitter custody and child support dispute with her former husband. Their successful attempts to litigate these issues in [] state court do not somehow transform these private individuals into state actors." (internal citation and quotation marks omitted)); Wideman v. Garcia, 382 F. App'x 741, 742 (10th Cir. 2010) ("[The plaintiff] sued . . . the mother of his daughter, asserting that she violated his constitutional rights by filing allegedly false affidavits in connection with [] state court child custody and support proceedings, and allegedly conspiring with [state] officials to deprive him of his parental rights and personal property through the illegal entry of child custody and support judgments. . . . The district court dismissed [the case] . . ., holding that [the plaintiff] had not sufficiently alleged facts demonstrating that [the defendant] was acting under color of state law. . . . [W]e find no fault in the decision of the

41

district court. [The defendant] was not a state official, nor could her decision to file several family-law actions against [the plaintiff] be plausibly read as a conspiracy with [state] officials."); Roush v. Roush, No. 91-2539, 952 F.2d 396 (table), 1991 WL 268269, at *1 (4th Cir. Dec. 18, 1991) (unpublished) ("[The plaintiff-father] asserts that [the defendant-mother] acted under color of state law to deprive him of his federal constitutional rights by initiating . . . wage [garnishment] . . . . [The defendant-mother] was merely pursuing remedies available under West Virginia law [for collection of child support], and although certain state employees are alleged to have assisted her, this is not sufficient to satisfy [the state action element of] § 1983."); Daniels v. Murphy, No. 06CV5841, 2007 WL 1965303, at *1-2 (E.D.N.Y. July 2, 2007) (unpublished) ("[The p]laintiff alleges that her son's father . . . has intimidated their son and engaged in brainwashing and Parental Alienation Syndrome . . ., and made fraudulent representations . . . relate[d] to a custody proceeding in state court. . . . The [c]ourt finds that, to the extent that [the] plaintiff asserts a Section 1983 claim against [the] defendant[-father], such a claim must fail as a matter of law because it does not allege that [he] was a state actor, or offer factual assertions from which it could be inferred that there was a sufficiently close nexus between [the defendant-father] and the [s]tate." (internal quotation marks omitted)).

42

In sum, "Plaintiff's Section 1983 claims [against Defendants Anthony and Baucom] must be dismissed because n[either D]efendant is a state actor. . . . [Rather, t]hey acted purely as private individuals in connection with the state court proceedings." Elmasri v. England, 111 F. Supp. 2d 212, 221 (E.D.N.Y. 2000) (dismissing Section 1983 claims against the plaintiff's ex-wife and her lawyer predicated on their involvement in child custody case).

The last remaining Defendant in the First Complaint, Defendant White, enjoys absolute immunity for the allegations against him. In that regard, the First Complaint alleges that Defendant White, as the "[a]ttorney for Cabarrus County CSE" (1:24CV531, Docket Entry 2 at 3), engaged in "fraud[ and deprived Plaintiff of] due process and equal protection of laws" (id. at 6 (capitalization and bold font omitted)), by "coerc[ing] and threaten[ing] jail and imputing of income if Plaintiff did not produce business tax filings for 2022 (though private)" (id.; see also id. at 8 ("The privacy agreement, article 12 of the Trust constitution was shown and provided to [Defendant] White, yet he insisted on more docs . . . .")). Thereafter, according to the First Complaint, "imputed income was suggested by [Defendant] White to [a Cabarrus County District Court] Judge[-Defendant] who used $72K a year" (id. at 6), which "inflated [Plaintiff's] income from $1850 per month used in temporary court order to $6,000 per month" (id.). The First Complaint further speculates, under a General Statement entitled

43

"Collussion [sic] for Financial Harm" (id. at 7 (all-caps and bold
font omitted)), that "[Defendant] White was behind the aggressive
activity from NC[ D]HHS, CSE [to suspend Plaintiff's insurance
license] as payments were being made and [there] was never such an
adamant issue before" (id.; see also id. at 10 (accusing Defendant
White, along with six other Defendants, of "causing stress related
health problems," but without any concrete allegations about
Defendant White (or any other Defendant) (capitalization and bold
omitted)), 11 (describing Defendant White, in Specific Statement
section, as (A) "[m]astermind of unlawful and illegal acts," (B)
"[i]nfluencer of all CSE Agents, court appointed attorney, District
Court Judges . . ., [and] Mecklenburg and Cabarrus County CSE
agencies," and (C) person "[r]esponsible for fraud, coercion,
duress, imputing of income, misrepresentation of facts, collusion
and willful intent to cause financial harm, threat of jail")).

"Even if such allegations are true, they do not state a claim
for damages under § 1983, as [Defendant White] is entitled to
absolute immunity for his prosecutorial role." Weller, 901 F.2d at
397 n.11 (affirming dismissal of Section 1983 claim against lawyer
representing city social services office in child welfare case);
see also, e.g., Hamill v. Wright, 870 F.2d 1032, 1037 (5th Cir.
1989) ("[The defendant] is entitled to full prosecutorial immunity
from damages [for] his decision to bring [child support] contempt
proceedings and his participation in those proceedings . . . .");

44

<u>Hunter v. Leggett</u>, No. 22CV424, 2022 WL 16552945, at *7 (E.D. Wis. Oct. 31, 2022) (unpublished) ("[A]ll of the acts [the plaintiff] attributes to [the defendants] were related to their efforts to enforce court orders requiring [him] to pay child support and/or to prosecute him for his failure to pay. Thus, [they] . . . are entitled to prosecutorial immunity."), <u>aff'd</u>, No. 22-3146, 2023 WL 4029764 (7th Cir. June 15, 2023) (unpublished); <u>Zatta v. Eldred</u>, No. SACV 18-2280, 2019 WL 6534447, at *6 (C.D. Cal. Sept. 30, 2019) (unpublished) ("[The p]laintiff's claims against these [d]efendants [are] based on their efforts in prosecuting and enforcing the child support orders and litigating other issues raised in the [s]tate [c]ourt [a]ction. . . . [They] are entitled to absolute prosecutorial immunity for their alleged attempts to litigate the issues raised and enforce the orders and judgments issued in the [s]tate [c]ourt [a]ction."), <u>recommendation adopted</u>, 2019 WL 6528580 (C.D. Cal. Dec. 4, 2019) (unpublished), <u>aff'd</u>, 840 F. App'x 266 (9th Cir. 2021); <u>Washington v. Montgomery Cnty. Common Pleas Ct.</u>, No. 3:17CV341, 2017 WL 5632881, at *2 (S.D. Ohio Oct. 30, 2017) (unpublished) ("[C]hild support enforcement attorneys . . . are entitled to prosecutorial immunity."), <u>recommendation adopted</u>, 2017 WL 5660023 (S.D. Ohio Nov. 20, 2017) (unpublished).

Regarding any injunctive relief sought from Defendant White via Section 1983, the Court should "abstain[] under the principles of federalism enunciated in *Younger v. Harris*, 401 U.S. 37 (1971)."

45

Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 10 (1987) (parallel citations omitted). Of relevance here, "[the Supreme] Court has extended *Younger* abstention to particular state civil proceedings that are akin to criminal prosecutions or that implicate a State's interest in enforcing the orders and judgments of its courts." Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69, 72-73 (2013) (internal citation omitted). "Circumstances fitting within the *Younger* doctrine . . . include . . . civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." Id. at 73 (internal quotation marks omitted).

As the Court (per then-Chief United States District Judge Thomas D. Schroeder) recently explained:

> The Younger inquiry proceeds in two steps. First, the [C]ourt considers whether the state proceeding at issue is one of the three types of proceedings that warrant Younger abstention: (1) an ongoing state criminal prosecution[], (2) certain civil enforcement proceedings that are akin to a criminal prosecution in important respects, and (3) pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions. Second, if the proceeding fits into one of these categories, then abstention is appropriate if there is (1) an ongoing state judicial proceeding, instituted prior to any substantial progress in the federal proceeding; that (2) implicates important, substantial, or vital state interests; and (3) provides an adequate opportunity for the plaintiff to raise the federal constitutional claim advanced in the federal lawsuit.

46

<u>Dawkins</u>, 2023 WL 1069745, at *3 (internal citations, ellipsis, and quotation marks omitted) (citing and quoting, inter alia, <u>Sprint</u>, 571 U.S. at 73, 78, respectively).

Starting with step one, this case "falls into [the] third category [of cases warranting <u>Younger</u> abstention] because [the underlying, ongoing state civil case] implicates how North Carolina courts manage their own child support proceedings – a subject in which the states have an especially strong interest." <u>Id.</u> at *4 (citing <u>Moore v. Sims</u>, 442 U.S. 415, 435 (1979)); <u>see also</u> <u>id.</u> (identifying "state court proceedings 'in which the State's contempt process is involved'" as one of two "prototypical examples of situations falling within this third category" and observing that "the contempt process 'stands in aid of the authority of the judicial system, so that its orders and judgments are not rendered nugatory'" (some internal quotation marks omitted) (first quoting <u>Juidice v. Vail</u>, 430 U.S. 327, 335 (1977); and then quoting <u>id.</u> at 336 n.12)). A review of the allegations made and relief requested in the First Complaint underscores the point:

1) the "beginning of [the] Cabarrus County CSE case [dates to] April 2022" (1:24CV531, Docket Entry 2 at 6; <u>see also</u> <u>id.</u> at 7 ("A Mecklenburg County [c]ase [] was active since 2012."));

2) "[f]rom the beginning in response to the summons from April/May 2022, [Plaintiff] mentioned that all [his] income, assets and property belong to a Trust and a UCC filing and Secured Party

47

agreement was in place" (id. at 8; see also id. at 9 ("[B]ecause of [the] Secured Party agreement, rights and benefits of [Plaintiff's] income, insurance license, etc. all belong to the Trust and the Trust has first lienholder privileges of labor and intellect."));

3) nonetheless, Plaintiff's "payments started for [the] Cabarrus County [c]ase [] in October 2022" (id. at 7; see also id. at 6 (referring to payment "calculations" made on "8/22/2022 and 7/31/2023"), 7 ("The $300 per month temporary order was being paid from October 2022 and March to August 2023 out of coercion and duress. [Defendant Anthony] requested for Child Support Enforcement (CSE) to go after more money from [] Plaintiff in March 2023. [ T]he amount ballooned to $1432 on 7/31/2023 . . . ."));

5) "[the t]emporary [o]rder was challenged on 3/6/23, however[, a Cabarrus County District Court Judge-Defendant] ordered a [c]ontempt of [c]ourt, with a 29-day . . . sentence in jail if [Plaintiff did] not pay[ a] purge of $655" (id. at 7);

6) "[o]n 6/14/23, there was an [o]rder of [c]ontempt filed and signed by [a Cabarrus County District Court Judge-Defendant] for failure to respond to the discovery served on [] Plaintiff" (id. at 8), after which a "[c]ourt appointed attorney . . . was provided [to Plaintiff] based on a show cause [order]" (id.);

7) additionally, after Plaintiff failed to "pay[ an arrearage of] $5200" (id. at 7), his "[insurance] license suspension happened on 9/6/2023" (id.) and his license "has not been reinstated" (id.);

48

8) "[i]n [a m]odification and permanent order signed on 10/30/2023, [a Cabarrus County District Court Judge-Defendant] said Plaintiff had the ability to earn $125K" (<u>id.</u> at 6);

9) Plaintiff's court-appointed attorney "appeared [at proceedings] on 12/22/23, 1/22/24 and 2/5/24" (<u>id.</u> at 8), but she "was dismissed on 2/16/24 by [] Plaintiff" (<u>id.</u>), apparently because she drafted a consent order providing that he would produce "all of the information [a Cabarrus County District Court Judge-Defendant] and [Defendant] White [] ask[ed] for in violation of Trust privacy agreements" (<u>id.</u>);

10) Plaintiff attempted to make a "Special Appearance and [a] challenge [to] the [Cabarrus County District C]ourt['s] jurisdiction over Trust matters at [a] March 4, 2024 hearing" (<u>id.</u>; <u>see also</u> <u>id.</u> ("Under Special Appearance, Plaintiff appeared as a living being, not a legal fiction . . . ."));

11) a Cabarrus County District Court Judge-Defendant "stated [ P]laintiff was being uncooperative because he didn't go behind the witness stand for [that s]how [c]ause [hearing]" (<u>id.</u>) and then "sentenc[ed] him to county jail for 7 days or a $3,000 bail" (<u>id.</u>; <u>see also</u> <u>id.</u> at 9 ("[Plaintiff's] motion for stay and transfer [to Superior Court] was denied by [the Cabarrus County District Court Judge-Defendant] on March 4, 2024. She denied dismissal of the case. She disregarded Special Appearance notice filed beforehand, though Plaintiff stated several times he was not there under

49

General Appearance, nor was he there to testify behind [the] witness stand. He was only present to challenge jurisdiction and errors of the [Cabarrus County District C]ourt."));

12) at a hearing on June 10, 2024, another Cabarrus County District Court Judge-Defendant "[d]enied dismissal of case" (id. at 12), "[d]enied modification of the case" (id.), and "[d]enied stay and transfer of the case" (id.);

13) "[a]s of June 19, 2024, [Plaintiff] determined that all support orders were invalid from the beginning, in 2012 up to present, due to lack of [d]ue [p]rocess" (id. at 7); and

14) Plaintiff thereafter filed the First Complaint seeking an order from this Court, inter alia, "[d]ismiss[ing his Cabarrus County child support] case . . . with prejudice" (id. at 13), "[s]et[ting] aside all arrears for [that] case" (id.), "[r]einstat[ing] his] life insurance license" (id.), and "[p]rotecti[ng him] from all CSE remedies" (id.).

This record material demonstrates that "[Plaintiff] filed this suit in federal district court in an effort to derail and nullify the state court's efforts [to enforce its child support orders] . . . ." Dawkins, 2023 WL 1069745, at *4. "[E]nforcing state court judgments cuts to the state's ability to operate its own judicial system . . . ." Harper v. Public Serv. Comm'n of W. Va., 396 F.3d 348, 352 (4th Cir. 2005). And the "state court orders which [Plaintiff] seeks to avoid undoubtedly qualify as being

50

'uniquely in furtherance of the state courts' ability to perform their judicial functions.'" Dawkins, 2023 WL 1069745, at *4 (quoting Sprint, 571 U.S. at 78) (citing North Carolina rulings recognizing (A) authority of North Carolina courts to take steps necessary to administer justice, including by issuing show cause orders, (B) continuing obligation of parties to comply with child support orders, and (C) propriety of civil contempt proceedings for enforcement of child support orders). "Consequently, this case fits comfortably into Sprint's third category of ongoing state proceedings that warrant Younger abstention." Id.

"The second step of the Younger inquiry requires consideration of the 'additional factors' laid out in Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423, 432 (1982) . . . ." Dawkins, 2023 WL 1069745, at *5. Beginning with the first of those factors, i.e., "whether there is 'an ongoing state judicial proceeding,'" id. (quoting Middlesex Cnty., 457 U.S. at 432), the record (detailed above) establishes that "[Plaintiff] is subject to an ongoing child support order, which is to be monitored by the North Carolina state court system and is subject to modification at any time," id. (citing North Carolina decisional and statutory authority discussing continuing judicial authority over child support orders). The second Middlesex County factor – which asks "whether that [ongoing] state proceeding 'implicates important state interests,'" id. (internal brackets omitted)

51

(quoting Middlesex Cnty., 457 U.S. at 432) – similarly supports Younger abstention in this case, because "states have a recognized interest in 'ordering and enforcing child support obligations," id. (internal quotation marks omitted); accord, e.g., Haizlip v. Peterson, No. 1:23CV210, 2024 WL 1120898, at *2 (M.D.N.C. Jan. 29, 2024) (unpublished) (Peake, M.J.), recommendation adopted, 2024 WL 1119441 (M.D.N.C. Mar. 14, 2024) (unpublished) (Osteen, J.); see also Moore, 442 U.S. at 435 (observing that "[f]amily relations are a traditional area of state concern"); Harper, 396 F.3d at 354 ("Interests like . . . family law . . . lie at the heart of state sovereignty, and a failure to abstain in the face of ongoing state proceedings [in that area] would disrespect the allocation of authority laid in place by the Framers.").

Consideration of "whether th[e ongoing] state proceeding provides 'an adequate opportunity to raise [federal] constitutional challenges,'" Dawkins, 2023 WL 1069745, at *5 (internal ellipsis omitted) (quoting Middlesex Cnty., 457 U.S. at 432), the third (and final) Middlesex factor, see id., also favors abstention under Younger, because (A) "[t]he Supreme Court has made clear that . . . 'state processes are equal to the task of . . . deciding the constitutional questions that may arise in child-welfare litigation,'" id. (internal brackets omitted) (quoting Moore, 442 U.S. at 435), and (B) North Carolina courts afford Plaintiff a venue for addressing such matters, see id. (citing federal and

52

North Carolina decisions confirming that litigants may pursue federal constitutional claims during child support litigation in North Carolina courts); see also Lesane v. Bell, No. 5:24CV564, 2024 WL 5056259, at *3 (E.D.N.C. Dec. 10, 2024) (unpublished) ("[B]y issuing a show cause order, the state court has expressly provided [the] plaintiff an opportunity to be heard. By scheduling a hearing, the state court indicated its willingness and ability to hear what [the] plaintiff has to say."); Dickens v. Durham Cnty., No. 1:18CV5, 2019 WL 13443852, at *2 (M.D.N.C. June 14, 2019) (unpublished) (Peake, M.J.) ("[The p]laintiff may appeal to higher state courts and eventually to the United States Supreme Court to the extent that he believes that his rights are being violated by the lower North Carolina state courts."), recommendation adopted, 2019 WL 13443853 (M.D.N.C. Aug. 5, 2019) (unpublished) (Osteen, J.), aff'd, 803 F. App'x 720 (4th Cir. 2020); Salih El Bey v. Kennedy, No. 3:15CV272, 2015 WL 11111355, at *1 (W.D.N.C. July 7, 2015) unpublished) ("[T]o the extent that [the p]laintiff may face criminal liability for a failure to pay child support, the state provides that he is entitled to appointment of counsel in the case of his inability to afford representation." (citing N.C. Gen. Stat. § 7A-451(a)(1))), aff'd, 621 F. App'x 197 (4th Cir. 2015).

"Accordingly, [all] requirements for Younger abstention are met." Lesane, 2024 WL 5056259, at *3. "Even [with] both steps [thus] satisfied, however, extraordinary circumstances may

53

nevertheless allow federal court intervention . . . ." Dawkins, 2023 WL 1069745, at *3; see also id. (noting limitation of such circumstances to instances where "the state brought the [underlying] action in bad faith or to harass, where the state statute is 'flagrantly and patently' unconstitutional, or where other 'extraordinary circumstances' exist that present a threat of immediate and irreparable injury" (quoting Younger, 401 U.S. at 53)). "[T]he path to extraordinary circumstances is exceedingly narrow." Air Evac EMS, Inc. v. McVey, 37 F.4th 89, 100 (4th Cir. 2022). The First Complaint does not present any of the "few carefully limited circumstances where a district court may disregard Younger's otherwise-ironclad mandate," Erie Ins. Exch. v. Maryland Ins. Admin., 105 F.4th 145, 151 (4th Cir. 2024) (internal quotation marks omitted).

First, as previously documented, Plaintiff's allegations against Defendant White amount to, at most, "vague allegations of bad faith [which] are clearly insufficient to trigger this exception." Dawkins, 2023 WL 1069745, at *5. "Nor does [the First Complaint allege facts sufficient to show that any statute] which supplies [any part of] the enforcement mechanism for child support obligations[] is 'flagrantly unconstitutional,'" id. (quoting Younger, 401 U.S. at 53), or that "other 'extraordinary circumstances' exist that present a threat of immediate and irreparable injury," id. at *3 (quoting Younger, 401 U.S. at 53);

54

to the contrary, the First Complaint's claim(s) against Defendant White rely on facially frivolous theories, such as that:

1) Plaintiff can avoid payment of child support by asserting "that all [his] income, assets and property belong to a Trust and a UCC filing and Secured Party agreement was in place" (1:24CV531, Docket Entry 2 at 8; <u>see also</u> <u>id.</u> at 9 ("[B]ecause of a Secured Party agreement, rights and benefits of [Plaintiff's] income, insurance license, etc. all belong to the Trust and the Trust has first lienholder privileges of [his] labor and intellect.")); and

2) Plaintiff can defeat the Cabarrus County District Court's jurisdiction by making a "Special Appearance notice fil[ing and] . . . stat[ing] several times he was not there under General Appearance" (<u>id.</u> at 9; <u>see also</u> <u>id.</u> at 12 ("Plaintiff is not subject to the Defacto government who rule the legal fiction created, the ENS LEGIS, RODNEY D. ARCHER without consent from the representative live agent. [] Plaintiff, thus the living being[,] does not give permission or personal jurisdiction to the county district courts and state schemes . . . .")).

"These assertions, along with others presented by Plaintiff, are couched in terms [commonly called] 'sovereign citizen' argument[s], which ha[ve] been rejected repeatedly by the courts." <u>Woods v. SC Dep't of Soc. Servs.</u>, No. 6:23CV4812, 2023 WL 7224542, at *3 (D.S.C. Oct. 11, 2023) (unpublished) (some internal quotation marks omitted), <u>recommendation adopted</u>, 2023 WL 7222667 (D.S.C.

55

Nov. 2, 2023) (unpublished); <u>see also</u> <u>id.</u> (recounting the plaintiff's descriptions of county department responsible for child support enforcement as "'fictitious entity'" and "[the p]laintiff '[a]s a natural person and a living soul'" with whom said department "cannot interface," and citing cases "reject[ing such] 'sovereign citizen' theor[ies] as baseless"). In particular:

> The crux of [the First] Complaint rests on the fact that [Defendant White] has pursued an action in [Cabarrus County District C]ourt to compel Plaintiff to pay child support; however, Plaintiff believes [Defendant White and the Cabarrus County District Court] lack[] the authority to compel [Plaintiff] to pay child support for reasons premised on [a] sovereign citizen theory. . . . [T]his contention is frivolous . . . .

<u>Id.</u>; <u>see also</u> <u>Cruel-El v. South Carolina</u>, No. 6:18CV1680, 2018 WL 3628844, at *4 (D.S.C. July 10, 2018) (unpublished) ("[The p]laintiff seems to allege that South Carolina does not have the legal authority to issue and enforce child support orders because [the p]laintiff, as a sovereign citizen, has not consented to such actions. In addition to being patently frivolous, this contention misunderstands the authority of South Carolina, as a sovereign State, to enact legislation and enforce that legislation through the State's governing institutions." (internal citation omitted)), <u>recommendation adopted</u>, 2018 WL 3619798 (D.S.C. July 30, 2018) (unpublished), <u>aff'd</u>, 744 F. App'x 185 (4th Cir. 2018).[17]

---

[17] Even divorced from the associated, sovereign-citizen-type rhetoric, Plaintiff's trust-related challenges to the underlying child support litigation appear frivolous. <u>See</u> <u>Harris v.</u>
(continued...)

56

Given the presence of conditions that satisfy both steps of the <u>Younger</u> inquiry and the absence of "extraordinary circumstances [that] may nevertheless allow federal court intervention," <u>Dawkins</u>, 2023 WL 1069745, at *3, the Court should conclude, with respect to any claim(s) for injunctive relief against Defendant White under Section 1983, "that <u>Younger</u> abstention is appropriate, and [that all such] federal claims [should be] dismissed with prejudice," <u>id.</u> at *6 (citing <u>Nivens v. Gilchrist</u>, 444 F.3d 237, 247 (4th Cir. 2006)); <u>see also</u> <u>Nivens</u>, 444 F.3d at 247 ("[W]hen a district court abstains from a case based on *Younger*, it should typically dismiss the case with prejudice; not on the merits, but instead because the [district] court is denied the equitable discretion ever to reach the merits." (internal citation omitted)).

Finally, to the extent Plaintiff has sued Defendant White "[i]n [his o]ffical [c]apacity" (1:24CV531, Docket Entry 2 at 3), as an "[a]ttorney for Cabarrus County CSE" (<u>id.</u>), the claims against Defendant White "represent only another way of pleading an action against [the] entity of which [he] is an agent," <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658, 690 n.55 (1978). The

---

[17](...continued)
<u>Department of Health & Hum. Servs.</u>, 555 P.3d 362, 365 (Utah Ct. App. 2024) (ruling that father "cannot use [] trusts for his personal benefit with one hand while using them as a shield against his creditors with the other hand in an effort to avoid his child support obligations"); <u>Breitenstine v. Breitenstine</u>, 62 P.3d 587, 593 n.1 (Wyo. 2003) (describing "use of [certain] trusts to avoid . . . child support . . . [a]s reprehensible").

Supreme Court has determined "that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." Id. at 690 (emphasis omitted). Yet, Plaintiff can maintain a claim against Cabarrus County (as Defendant White's employer) only where the conduct "that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that [local governmental] body's officers," id., or a "governmental 'custom' even though such a custom has not received formal approval through the [local governmental] body's official decisionmaking channels," id. at 691; see also id. (holding that local government unit "cannot be held liable under § 1983 on a respondeat superior theory" (italics omitted)). The First Complaint makes no allegation that a policy or custom of Cabarrus County "cause[d Defendant White] to violate [Plaintiff's] constitutional rights," id. at 692. (See 1:24CV531, Docket Entry 2.) "Therefore, no claim is stated against [Cabarrus County] under [Section] 1983." Weller, 901 F.2d at 398; see also Dawkins, 2023 WL 1069745, at *6 ("[T]he § 1983 claims against [the county department] fail as a matter of law because [the] complaint is completely devoid of any allegations of a municipal policy or custom that caused [the plaintiff's] injury. For the same reason, the same claims against [the county department's employee] in her official capacity fail." (internal citations omitted)).

58

With all of Plaintiff's federal claims subject to dismissal, the Court should decline to exercise supplemental jurisdiction over any state claims in the First and Second Complaints.[18]  Federal courts possess supplemental jurisdiction over certain state claims - even after federal question jurisdiction ceases to exist; however, federal courts need not maintain supplemental jurisdiction under such circumstances.  See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); see also Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995) ("[T]rial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished.").  "Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy."  Shanaghan, 58 F.3d at 110.  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7

---

[18]  The record does not establish diversity-of-citizenship jurisdiction over any state claims.  (See 1:24CV531, Docket Entry 2 at 1-3 (listing addresses in North Carolina for Plaintiff and Defendants); 1:25CV74, Docket Entry 1 at 1-2 (same).)

(1988). Because the First and Second Cases have not moved beyond the initial pleading phase, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state claims. <u>See, e.g.</u>, <u>Dawkins</u>, 2023 WL 1069745, at *7 ("The [C]ourt, in its discretion, declines to exercise supplemental jurisdiction over th[e plaintiff's state] claim now that all federal claims over which it had original jurisdiction have been dismissed."); <u>Nance v. City of Albemarle</u>, 520 F. Supp. 3d 758, 802 (M.D.N.C. 2021) (Osteen, J.) ("Since this matter has not progressed past the motion to dismiss stage and only state law claims remain, this [C]ourt declines to exercise its supplemental jurisdiction over [those state law claims].").

<u>CONCLUSION</u>

The federal claims in the First and Second Complaints all suffer from fatal legal deficiencies, with most such deficiencies (including as to all the federal claims in the Second Complaint) so obvious as to render those claims frivolous (and, in some instances, malicious).

**IT IS THEREFORE ORDERED** that the instant Application (1:24CV531, Docket Entry 1) is **GRANTED FOR THE LIMITED PURPOSE OF ALLOWING THE COURT TO CONSIDER A RECOMMENDATION OF DISMISSAL.**

**IT IS FURTHER ORDERED** that the instant Request (1:25CV74, Docket Entry 3) is **DENIED.**

60

**IT IS RECOMMENDED** that (A) all federal claims in the First Case be dismissed under Section 1915(e)(2)(B), (B) all federal claims in the Second Case be dismissed as frivolous or malicious under the Court's inherent authority, and (C) all state claims in the First and Second Cases be dismissed without prejudice under Section 1367(c)(3).

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

April 14, 2025